RENDERED:  JUNE 16, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0116-DG

COMMONWEALTH OF KENTUCKY                                    APPELLANT


ON REVIEW FROM COURT OF APPEALS
V.                              NO. 2018-CA-1574
WOODFORD CIRCUIT COURT NO. 17-CR-00034

DOVONTIA REED                                              APPELLEE


**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**<u>AFFIRMING</u>**

The grand jury indicted Dovontia Reed on one count of first-degree robbery, one count of possession of a handgun by a convicted felon, and one count of receiving stolen property (firearm).  Reed moved pretrial to suppress the location data obtained from the police's search of his real-time cell-site location information (CSLI) and the evidence obtained from the search.  The trial court denied his motion.  Reed then entered a conditional guilty plea, reserving his right to challenge the denial of his suppression motion.

On review, the Court of Appeals reversed the trial court's denial of Reed's suppression motion, finding that the officers' acquisition of Reed's real-time CSLI constituted a warrantless, unreasonable search.  Additionally, the Court of Appeals found that the good-faith exception to the exclusionary rule did not apply because the officers were not acting in reliance on binding precedent.

We granted the Commonwealth's motion for discretionary review. Like the Court of Appeals, we find that the police acquisition of Reed's real-time CSLI was a warrantless, unreasonable search, and we find that the good-faith exception to the exclusionary rule does not apply in this case. Accordingly, we affirm the decision of the Court of Appeals to reverse the trial court's judgment and remand this case to the trial court for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

Late one night, Dovontia Reed called Kirby Caldwell, an acquaintance, on his cell phone. Reed told Caldwell that he had run out of gas and asked Caldwell to meet him at a gas station in Versailles. When Caldwell arrived there, he alleges that Reed threatened him at gunpoint and demanded that Caldwell give him whatever cash Caldwell was carrying. Then Reed climbed into the passenger seat of a Nissan Altima and left the gas station.

Caldwell called the police, and an officer arrived at the gas station to investigate. Caldwell told the officer what had happened and described the vehicle in which Reed fled. The officer examined the gas station's security-camera footage to identify the vehicle and obtain its license plate number. Caldwell also provided the officer with Reed's cell-phone number.

The officer contacted dispatch, provided Reed's cell-phone number, and requested dispatch contact Reed's cell-service carrier and obtain Reed's real-time CSLI. The carrier's initial ping showed Reed was traveling on the Bluegrass Parkway. The carrier continued to ping the phone for the next hour and a half, providing the police with its CSLI continually during that period.

2

When the cell-service carrier's ping showed that Reed was returning toward Versailles, an officer stationed himself on the road in anticipation of Reed's approach. When the officer spotted the Nissan Altima, he pulled it over and arrested Reed.

The grand jury indicted Reed on one count of first-degree robbery, one count of possession of a handgun by a convicted felon, and one count of receiving stolen property. Before trial, Reed moved to suppress the CSLI obtained by the police and the evidence obtained as a result of the search on the grounds that the police unlawfully obtained the CSLI without a warrant. The trial court denied the motion, finding that the officers' access of Reed's CSLI was not a search under the Fourth Amendment and, therefore, no warrant was required. Reed entered a conditional guilty plea, reserving the right to appeal the trial court's decision denying suppression of the CSLI evidence.

The Court of Appeals reversed the decision of the trial court, finding that police acquisition of a person's CSLI implicates significant privacy concerns and thus the Fourth Amendment requires a warrant to search a person's CSLI. Additionally, the Court of Appeals found that the good-faith exception to the warrant requirement did not apply because this Court's decision in *Hedgepath v. Commonwealth* alerted officers that the warrant requirement for obtaining real-time CSLI was an unsettled point of law.[1] The Court of Appeals remanded

---

[1] 441 S.W.3d 119 (Ky. 2014).

the case to the trial court for further proceedings in accordance with this holding. The Commonwealth moved for discretionary review, and we granted the Commonwealth's request to address this issue of first impression.

## II.  ANALYSIS

In reviewing a trial court's decision to deny a motion to suppress evidence, we accept the trial court's findings of fact as conclusive if they are supported by substantial evidence.[2]  We then review de novo the trial court's application of the law to those facts.[3]  In this case, the application of the good-faith exception to the exclusionary rule hinges upon the existence of binding appellate precedent supporting the officers' actions.  As such, we also review that issue de novo.

Regarding the trial court's denial of Reed's suppression motion, the pertinent factual findings are uncontested: the investigating officers contacted Reed's cell-service provider, obtained Reed's real-time CSLI, used this CSLI to track Reed in real time on a roadway, performed a traffic stop, and placed Reed under arrest.  We find these facts to be supported by substantial evidence, and, as such, we focus our analysis on the questions of law presented.

**A. By obtaining Reed's real-time CSLI, the officers conducted a search under the Fourth Amendment to the United States Constitution and under Section 10 of the Kentucky Constitution.**

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,

---

[2] *Maloney v. Commonwealth*, 489 S.W.3d 235, 237 (Ky. 2016).

[3] *Id.*

4

shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

This Court has held this provision to mean that "[a]ll searches without a valid search warrant are unreasonable unless shown to be within one of the exceptions to the rule that a search must rest upon a valid warrant."[4]

The language of Section 10 of the Kentucky Constitution varies from the Fourth Amendment only in that it replaces the word *effects* with the word *possessions*. This Court has previously held that no substantial difference results from this variation in language.[5] So this Court looks to the United States Supreme Court's interpretation and application of the Fourth Amendment for guidance in construing Section 10.[6]

To run afoul of the Fourth Amendment, an action by police must be warrantless, must constitute a search, and no established exception to the warrant requirement must be applicable. In this case, the Commonwealth does not dispute that the officers did not get a warrant before obtaining Reed's real-time CSLI. And the Commonwealth failed to raise any argument that an established exception to the warrant requirement existed. So our analysis hinges upon whether the acquisition of a person's real-time CSLI constitutes a search.

---

[4] *Cook v. Commonwealth*, 826 S.W.2d 329, 331 (Ky. 1992) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971)).

[5] *Youman v. Commonwealth*, 224 S.W. 860, 862 (Ky. 1920).

[6] *Id.*

The federal courts' jurisprudence on the Fourth Amendment has shifted dramatically since the amendment's adoption. Initially, the Fourth Amendment was believed to be intimately related to the Fifth Amendment.[7] The seizure of an individual's property and use of that property as evidence against him was found to be inherently unreasonable and violative of the Fifth Amendment's prohibition on compulsory self-incrimination.[8] However, writing in dissent in *Olmstead v. United States*, Justice Brandeis first presented a revisionist theory of the intimate-relation doctrine.[9] Instead of primarily protecting the right against compulsory self-incrimination, he suggested that the Fourth Amendment's central concern was an individual's right to be left alone—the prevention of the invasion of an individual's privacy.[10]

Justice Brandeis's theory of the Fourth Amendment as a protection for personal privacy would not take hold until nearly 40 years later in *Katz v. United States*.[11] In *Katz,* the Court held that the use of an electronic recording device to surveil a suspect's conversation in a telephone booth constituted a

---

[7] *Boyd v. United States*, 116 U.S. 616, 633 (1886).

[8] *Id.* at 634-35.

[9] 277 U.S. 438, 477-79 (1928) (Brandeis, J., dissenting).

[10] *Id.* at 478.

[11] 389 U.S. 347 (1967). Prior to *Katz*, in *Silverman v. United States*, the Court held that the use of a "spike mike" to gather audio surveillance of a suspect was in violation of the Fourth Amendment, even though the surveillance did not technically involve a trespass into a constitutionally protected area. 365 U.S. 505, 512 (1961). Justice Douglas, concurring with the majority, remarked that the sole concern of a Fourth Amendment analysis should be whether the privacy of an individual's home was invaded. *Id.* at 512-13 (Douglas, J., concurring). However, the majority's analysis did not consider Silverman's privacy as the central point of the Fourth Amendment violation but instead focused on the actual intrusion upon a constitutionally protected area.

violation of the Fourth Amendment, despite the lack of invasion of a traditionally constitutionally protected space.[12]  Concurring with the majority, Justice Harlan described a second sphere protected by the Fourth Amendment: areas in which a person has a reasonable expectation of privacy.[13]

In 1996, this Court adopted Justice Harlan's *Katz* analysis in *LaFollette v. Commonwealth.*[14]  The analysis first considers whether "the individual manifests a subjective expectation of privacy in the object of the challenged search," and, second, whether "society is willing to recognize that subjective expectation as reasonable."[15]  If both elements are fulfilled, the individual is said to have a reasonable expectation of privacy in the challenged object such that a warrantless search of that item is unconstitutional under the Fourth Amendment.  In *LaFollette*, the Court held that LaFollette had no reasonable expectation of privacy in the heat emitted from his greenhouse because he had employed no heat-containment measures.[16]  Because LaFollette knowingly exposed these heat emanations to the public, the Court concluded those emanations could not be the subject of Fourth Amendment protections.[17]

In *Carpenter v. United States*, the United States Supreme Court considered whether an individual has a reasonable expectation of privacy in his

---

[12] *Katz*, 389 U.S. at 353, 359.

[13] *Id.* at 361 (Harlan, J., concurring).

[14] 915 S.W.2d 747, 749 (Ky. 1996), *overruled on other grounds by Hunter v. Commonwealth*, 587 S.W.3d 298 (Ky. 2019).

[15] *Id.* (citing *Katz v. United States*, 389 U.S. 347, 361 (Harlan, J., concurring)).

[16] *Id.*

[17] *Id.* (citing *California v. Greenwood*, 486 U.S. 35 (1987)).

cell phone's historical CSLI.[18]  In that case, law enforcement suspected

Carpenter of involvement in a string of robberies.[19]  Acting without a warrant,

officers contacted Carpenter's cell-phone carrier to obtain his historical CSLI[20]

for a period of 127 days.[21]  At trial, Carpenter challenged the admission of the

historical CSLI into evidence, claiming that the officers' action constituted a

warrantless search under the Fourth Amendment.[22]

In considering whether an individual has a reasonable expectation of

privacy in his historical CSLI, the Court in *Carpenter* considered two cases that

involved a suspect's movement along public roadways: *United States v. Knotts*[23]

and *United States v. Jones*.[24]  In *Knotts*, police were aware of Tristan

Armstrong's intention to purchase chemicals of the sort used to manufacture

illicit drugs.[25]  With the permission of the chemical manufacturer, police placed

a beeper[26] inside a container of chemicals Armstrong was scheduled to pick

---

[18] 138 S.Ct. 2206 (2018).

[19] *Id.* at 2212.

[20] Cell phones function by connecting to radio antennas called "cell sites." 138 S.Ct. at 2211-12.  Cell phones continuously scan the area around them, seeking the strongest available signal, generally from the nearest cell site. *Id.*  Historical CSLI is a time-stamped, automatically generated log of a particular cell phone's connection to various cell sites.  *Id.*

[21] *Id.* at 2212.

[22] *Id.*

[23] 460 U.S. 276 (1983).

[24] 565 U.S. 400 (2012).

[25] 460 U.S. at 278.

[26] "A beeper is a radio transmitter, usually battery operated, which emits periodic signals that can be picked up by a radio receiver[,]" allowing officers to track the beeper's location. *Id.* at 277.

8

up.[27]  When he picked up the chemicals, police followed him to his ultimate destination: a cabin on Knotts's property that housed a drug laboratory.[28]  After monitoring the location of the beeper for three days, officers obtained and executed a search warrant for the cabin, finding substantial evidence of the manufacturing of illicit substances.[29]

At trial, Knotts moved to suppress the evidence discovered as a result of the warrantless beeper monitoring.[30]  The trial court denied his motion, and the United States Supreme Court affirmed, holding that "the use of 'augment[ed]' visual surveillance did not constitute a search because '[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another.'"[31]

In contrast, in *Jones*, officers installed a GPS tracker on a suspect's vehicle and monitored his movements for 28 days.[32]  There, the Court held that the officers physically trespassed on the vehicle and, as such, violated the Fourth Amendment.[33]  But, the Court in *Jones* also recognized that privacy concerns would be implicated if the officers had used the vehicle's stolen

---

[27] *Id.* at 278.

[28] *Id.* at 279.

[29] *Id.*

[30] *Id.*

[31] 138 S. Ct. at 2215 (quoting *Knotts*, 460 U.S. at 281, 282).

[32] 565 U.S. at 404-05.

[33] *Id.*

vehicle-detection system or the GPS in the suspect's cell phone to track the suspect.[34]

The Court in *Carpenter* found the acquisition of a person's historical CSLI to be similar to the GPS monitoring that took place in *Jones*, with both revealing "detailed, encyclopedic, and effortlessly compiled" location information.[35] Although some of the CSLI revealed Carpenter to be located on public thoroughfares, as in *Knotts*, by obtaining 127 days of Carpenter's historical CSLI, the officers had far exceeded the Court's authorization in *Knotts* of the limited use of a beeper during a discrete automotive journey.[36] Instead, the Court likened police tracking of historical CSLI to the near perfect surveillance usually only achieved by an ankle monitor.[37]

Ultimately, the Court in *Carpenter* held that the officers' access of Carpenter's historical CSLI invaded Carpenter's reasonable expectation of privacy in "the whole of his physical movements," reasoning that the Court must "take account of more sophisticated systems [of surveillance] that are already in use or in development" and avoid leaving individuals "at the mercy of advancing technology[.]"[38] But the Court in *Carpenter* limited its holding to the facts presented, and the Court explicitly stated that it was not considering real-time CSLI in its ruling.

---

[34] *Id.* at 426, 428 (Alito, J., concurring in judgment).

[35] 138 S.Ct. at 2216.

[36] *Id.* at 2217.

[37] *Id.* at 2218.

[38] *Id.* at 2219, 2218, 2214.

At issue in Reed's case is such real-time CSLI, sometimes referred to as "prospective CSLI."[39]  Because the *Carpenter* Court declined to rule regarding real-time CSLI, this Court must determine under the present facts whether individuals have a reasonable expectation of privacy in their real-time CSLI under the Fourth Amendment.[40]  Central to our analysis is the fact that a decision by this Court that a certain area of personage or property is not subject to the warrant requirement under the Fourth Amendment must be a decision that is reasonable—something "the average citizen is willing to accept."[41]

Real-time CSLI is not a passive location record but data generated by an affirmative action—a "ping"—taken by the cell-service provider at the behest of a law enforcement officer.  By "pinging" an individual's cell phone, the cell-service provider is able to determine, instantaneously, the cell phone's location in relation to the available cell sites and to communicate that location information to law enforcement.[42]  CSLI, whether real-time or historic, can be

[39] *See Houston v. State*, 482 P.3d 728 (Table), 2021 WL 1040976, at *4 (Nev. 2021); *State v. Brown*, 202 A.3d 1003, 1016-17 (Conn. 2019); *Commonwealth v. Augustine*, 4 N.E.3d 846, 855 n.24 (Mass. 2014).

[40] At present, only one federal court of appeals has ruled on this issue. *United States v. Hammond*, 996 F.3d 374, 389-90 (7th Cir. 2021) (holding police acquisition of Hammond's real-time CSLI for several hours did not constitute a search under the Fourth Amendment).

[41] *Commonwealth v. Cox*, 491 S.W.3d 167, 173 (Ky. 2015) (Noble, J., concurring).

[42] *Houston*, 2021 WL 1040976, at *4-6.

used to determine a cell phone's location with near perfect accuracy at any time the phone is powered on.[43]

In obtaining an individual's cell phone's real-time CSLI, police commandeer the cell phone and its transmissions for the purpose of locating that individual.[44] We find this usurpation of an individual's private property profoundly invasive, and we liken it to a technological trespass. Such an appropriation of an individual's cell phone is precisely the sort of invasion that we find the average citizen unwilling to accept. This Court has long recognized "the importance of maintaining our right to privacy against intrusion by electronic surveillance[.]"[45] In fact, writing in concurrence in *United States v. Jones*, Justice Alito expressed concern about the presence of location-tracking systems and software in vehicles and cell phones, recognizing a lack of legislation regulating law enforcement's use of such technology.[46] In the absence of statutory law, Justice Alito maintained that it is the role of the courts to limit the use of GPS tracking to "a degree of intrusion" anticipated by a reasonable person.[47] Today we hold that individuals have an objectively reasonable expectation that their cell phones will not be used as real-time tracking devices through the direct and active interference of law enforcement.

---

[43] *Id.*

[44] *See Carpenter*, 138 S.Ct. at 2217 (characterizing the police acquisition of an individual's CSLI as "leverag[ing] the technology of a wireless carrier").

[45] *Basham v. Commonwealth*, 675 S.W.2d 376, 380 (Ky. 1984).

[46] 565 U.S. at 428-29.

[47] *Id.* at 430.

The search of the contents of a cell phone is an invasion of a person's reasonable expectation of privacy sufficient to merit Fourth Amendment protection.[48]  We find no reason why such an expectation of privacy would not extend to data unwittingly, involuntarily transmitted by a person's cell phone to their cell-service provider regarding their location.  Police may not subvert the warrant requirement merely by going directly to the cell-service provider.

In rejecting the application of the third-party doctrine in this case, we find the reasoning of the United States Supreme Court in *Carpenter* compelling.[49]  The third-party doctrine dictates that a person can have "no legitimate expectation of privacy in information he voluntarily turns over to third parties."[50]  In *Carpenter*, the Court distinguished CSLI from other information, like bank records and outgoing-call logs, that are generally available to police without a warrant as a result of the third-party doctrine.[51] The Court reasoned that CSLI is qualitatively different than the information previously obtained by police under the doctrine—a distinct, new category of information to which the government was seeking application of the doctrine.[52] The Court found that the deeply revealing nature of historical CSLI as well as the involuntary conveyance of the information to the cell-service provider

---

[48] *Riley v. California*, 573 U.S. 373, 401 (2014); *Hedgepath*, 441 S.W.3d at 129; *Franklin v. Commonwealth*, No. 2016-SC-000330-MR, 2017 WL 5031531, at *2 (Ky. Mar. 24, 2017).

[49] 138 S.Ct. at 2217.

[50] 138 S.Ct. at 2216 (citing *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979)).

[51] *Id*. at 2216.

[52] *Id*. at 2216, 2219.

implicated a reasonable expectation of privacy in the information, regardless of the disclosure of the information to a third-party.[53] As such, the *Carpenter* Court declined to extend the third-party doctrine to such information.[54] We agree, and in confronting "new concerns wrought by digital technology," we must carefully avoid "uncritically extend[ing] existing precedents."[55]

Similar to historical CSLI, real-time CSLI is generated without a cell-phone owner's knowledge or consent.[56] Moreover, we find that police ability to usurp an individual's cell phone and use it as a real-time tracking device is deeply invasive and certainly implicates the same or greater privacy interests as acquisition of an individual's historical CSLI. We find police acquisition of

---

[53] *Cf. Williams v. Commonwealth*, 213 S.W.3d 671, 681-83 (Ky. 2006) (holding that Kentuckians have no reasonable expectation of privacy in data from the Kentucky All-Schedule Prescription Electronic Reporting System (KASPER) such that statutorily specified personnel accessing such data does not constitute a search).

[54] 138 S.Ct. at 2216-17.

[55] *Id.* at 2222.

[56] To say that an individual may reasonably decline to own a cell phone ignores the practical realities of modern society. Citizens use cell phones in innumerable ways to promote their livelihoods and advance the guarantees of the rights and privileges afforded by both the Kentucky and United States Constitutions. For instance, people use their cell phones to engage in commerce, participate in free speech, promote political ideals, attend worship services, surf the internet, and safeguard confidential and privileged information. To suggest that people can safeguard their right to privacy by simply not owning a cell phone disregards the realities of participation in modern society. The need for cell phones and mobile devices is magnified as telecommunications companies discontinue landline phone services in some areas and shut down 3G wireless networks, making older phones and devices obsolete. *See* Wesley Kerrick, *Beshear Signs Telecom Deregulation Bill*, LOUISVILLE BUSINESS FIRST (Mar. 25, 2015), https://www.bizjournals.com/louisville/news/2015/03/25/ky-gov-steve-beshear-signs-telecom-deregulation.html (explaining that telecommunications companies are permitted to discontinue landline phone service in urban areas of Kentucky as long as they provide some type of wireless services or voice-over Internet protocol in these areas).

real-time CSLI to be invasive and violative of an individual's reasonable expectation of privacy, and the third-party doctrine inapplicable to it.[57]

The Commonwealth attempts to reframe the Court's holding in *Carpenter* (that the third-party doctrine is inapplicable to CSLI) as being limited to rare cases in which an individual's expectation of privacy is so strong as to overcome the doctrine. We reject the idea that there exist degrees of reasonable expectation of privacy such that intrusion upon certain degrees is constitutionally permissible. If the expectation of privacy is found to be reasonable, police are required to comply with the Fourth Amendment's warrant requirement in performing a search.

The Commonwealth's main argument in support of the constitutionality of the police acquisition of Reed's CSLI relies upon the United States Supreme Court's holding in *United States v. Knotts*.[58] The Commonwealth goes to great lengths to analogize Reed's case to *Knotts*, but its argument fails, primarily, because it mischaracterizes the issue at hand. The Commonwealth contends that, under *Knotts*, an individual has no reasonable expectation of privacy while driving on a roadway, and thus any acquisition of an individual's real-

---

[57] Permitting application of the third-party doctrine to real-time CSLI would drastically alter the landscape of digital privacy. By the same logic offered by the Commonwealth, law enforcement could contact application developers whose applications are authorized to use the camera and microphone on a cell phone. Law enforcement could then, via those application developers, commandeer the cell phone as a photo, video, and audio surveillance device, simply because the cell phone's owner granted authorization to those applications. A decision to allow the application of the third-party doctrine to CSLI would leave citizens unwittingly "at the mercy of advancing technology." *Kyllo v. United States*, 533 U.S. 27, 35 (2001). We decline to do so today.

[58] 460 U.S. at 281-82.

15

time CSLI while he is driving on a roadway cannot be considered an invasion of a reasonable expectation of privacy. The Commonwealth fails to recognize that "[a] person does not surrender all Fourth Amendment protection by venturing into the public sphere."[59] Rather, "what [a person] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."[60]

We do not disagree that an individual has no reasonable expectation of privacy in his movements on a public road and, thus, law enforcement may constitutionally observe those movements. But at issue in this case is not the observation of Reed's movements on a roadway or the traffic stop performed on Reed's vehicle but the acquisition of Reed's CSLI that enabled officers to conduct a dragnet to intercept Reed's vehicle. At the time police pinged Reed's cell phone, Reed was not under visual police surveillance. Instead, the only reason police were able to locate and surveil Reed on a roadway was as a result of their acquisition of Reed's CSLI. It is the constitutionality of the acquisition of Reed's CSLI, not of his traffic stop, that we consider today. As such, we regard *Knotts* as inapplicable in this case. We find that a person's reasonable expectation of privacy in his CSLI is unaffected by his or his cell phone's physical location at the time the CSLI is generated or acquired by police.

Next, the Commonwealth contends that police acquisition of Reed's CSLI was permissible because the location information did not reveal Reed to be located in a constitutionally protected space, like his home. We do not find this

---

[59] *Carpenter*, 138 S.Ct. at 2217.

[60] *Katz*, 389 U.S. at 351.

reasoning compelling. The Commonwealth advocates for a post-hoc, case-by-case analysis to determine whether police acquisition of CSLI violates an individual's rights under the Fourth Amendment. But the Commonwealth fails to recognize that a "search in violation of the constitution is not made lawful by what it brings to light."[61] Although the officers' acquisition of Reed's CSLI did not reveal him to be in a traditionally constitutionally protected space, the officers had no way of knowing, at the time the data was requested, where the real-time tracking would lead them. The Commonwealth suggests that, because of this uncertainty, officers will always be required to obtain a warrant before obtaining a suspect's real-time CSLI. When we consider the ease with which technology allows police to obtain warrants and the invasive nature of a search of a person's CSLI, we find the Commonwealth's concern "hardly a compelling argument against the requirement."[62] As the Commonwealth conceded at oral argument, obtaining a warrant before the acquisition of an individual's CSLI is simply the best practice.

The Commonwealth contends that, to the extent that the warrantless acquisition of CSLI might violate a person's expectation of privacy, such a violation could be cured by a suppression hearing conducted by the trial court. The Commonwealth reasons that a post-hoc analysis of warrantless CSLI collected would allow the trial court to suppress any portion of the data that

---

[61] *Fields v. Commonwealth*, 368 S.W.3d 324, 326 (Ky. 1963) (internal citations and quotations omitted).

[62] *United States v. Karo*, 468 U.S. 705, 718 (1984).

disclosed the individual and his cell phone to be located in a constitutionally protected space, like the home.

We find suppression to be a wholly inadequate remedy for a violation of the Fourth Amendment in this case. A warrantless acquisition of CSLI is a violation of a person's reasonable expectation of privacy. Such an invasion cannot be remedied by suppression. The invasion itself is part of the constitutional violation, not merely the use of the evidence obtained therefrom, so the only way the Fourth Amendment can be satisfied is by the officer obtaining a valid, duly executed search warrant before the acquisition of the individual's CSLI.

Today we answer the question left open by this court in *Hedgepath v. Commonwealth* and by the United States Supreme Court in *Carpenter*—individuals have a reasonable expectation of privacy in their cell phone's cell-site location information and, thus, that information is entitled to constitutional protection under the Fourth Amendment. Absent an exception to the warrant requirement, as described below, law enforcement must obtain a warrant before acquiring a person's cell-site location information.

To hold, in the alternative, that there is no reasonable expectation of privacy in CSLI, would empower government agents to invade individuals' most private and closely-held constitutionally protected activities. For instance, the government could surveil in real time when, and precisely where, individuals were in the confines of their private homes, at a place of worship, engaging in

18

political activities, or exercising their right to free speech.  Such an invasion is precisely the sort that we find the average citizen unwilling to accept.

**B. No exception to the warrant requirement exists in Reed's case.**

Having concluded that the acquisition of a person's real-time CSLI constitutes a search for purposes of the Fourth Amendment, we now consider whether an exception to the warrant requirement exists in Reed's case.  If no exception is applicable, the officers' search of Reed's real-time CSLI is presumptively unreasonable and, as such, unconstitutional.[63]

This Court has adopted several exceptions to the warrant requirement, including searches or seizures performed in the course of a protective sweep,[64] while in hot pursuit of a suspect,[65] with a suspect's consent,[66] incident to a lawful arrest,[67] on automobiles,[68] during a "stop-and-frisk,"[69] as an administrative inspection,[70] of objects in the officers' plain view,[71] or other

---

[63] *Helphenstine v. Commonwealth*, 423 S.W.3d 708, 714 (Ky. 2014) (citing *Katz*, 389 U.S. at 357).

[64] *Guzman v. Commonwealth*, 375 S.W.3d 805, 807 (Ky. 2012); *Kerr v. Commonwealth*, 400 S.W.3d 250, 266 (Ky. 2013).

[65] *Styles v. Commonwealth*, 507 S.W.2d 487, 488 (Ky. 1974).

[66] *Cook*, 826 S.W.2d at 331.

[67] *McCloud v. Commonwealth*, 286 S.W.3d 780, 784-85 (Ky. 2009); *Styles*, 507 S.W.2d at 489.

[68] *Hedgepath*, 441 S.W.3d at 127-28; *Chavies v. Commonwealth*, 354 S.W.3d 103, 110-11 (Ky. 2011), *abrogated on other grounds by Morris v. Commonwealth*, 2019-SC-0606-MR, 2021 WL 1133612 (Ky. Mar. 25, 2021).

[69] *Crowder*, 884 S.W.2d at 652.

[70] *Williams*, 213 S.W.3d at 675-76.

[71] *Kerr*, 400 S.W.3d at 266 (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)); *Styles*, 507 S.W.2d at 489.

exigent circumstances that require "swift action to prevent imminent danger to life or serious damage to property, and action to prevent the imminent destruction of evidence."[72] These exceptions to the warrant requirement were adopted because, at times, this Court has found that the burdens associated with obtaining a warrant are likely to frustrate the purpose of the search.[73]

In this case, the Commonwealth failed to raise the argument that the exigent-circumstances exception to the warrant requirement applied in Reed's case. Even if the argument were properly preserved, we find the exigent-circumstances doctrine is inapplicable in this case. The exigent-circumstances exception to the warrant requirement is applicable in situations when, considering the totality of the circumstances, an officer reasonably finds that swift action is required to either prevent imminent danger to life or serious damage to property or to prevent the imminent destruction of evidence.[74] We reiterate that it is the duty of the Commonwealth to demonstrate that exigent circumstances were present to justify a warrantless search.[75]

In Reed's case, the officers did not describe a need to preserve any evidence in Reed's possession, nor did they testify that Reed presented an

---

[72] *Carlisle v. Commonwealth*, 601 S.W.3d 168, 181-82 (Ky. 2020) (internal citations and quotations omitted). *See also Goben v. Commonwealth*, 503 S.W.3d 890, 914-15 (Ky. 2016) (provision of emergency aid); *Pate v. Commonwealth*, 243 S.W.3d 327, 331 (Ky. 2007) (risk of danger to police or others); *Posey v. Commonwealth*, 185 S.W.3d 170, 173 (Ky. 2006) (imminent destruction of evidence).

[73] *Williams*, 213 S.W.3d at 677.

[74] *Carlisle*, 601 S.W.3d at 181-82.

[75] *Commonwealth v. McManus*, 107 S.W.3d 175, 177 (Ky. 2003).

"imminent danger" to the life of another. Reed was not alleged to have committed a string of robberies, nor did he provide information to Caldwell that he intended to commit another robbery after departing from the gas station. Further, Reed was unaware of the officers' pursuit of him, so "hot pursuit" does not provide grounds under which we could apply the exigent-circumstances exception.[76] Although Reed may have fled the scene of the alleged crime, because officers were not present at the scene while Reed was present, his flight cannot be described as fleeing from the police, and their attempts at locating him cannot be described as a "hot pursuit" meriting application of the exigent-circumstances exception to the warrant requirement. None of the grounds established for the application of the exigent-circumstances exception to the warrant requirement were present in this case.

If this Court were to find the exigent-circumstances exception to apply in Reed's case, such an exception could be applied to any case in which a suspect is accused of criminal conduct and the police seek to capture that suspect. We refuse to so expand the scope of this exception to the warrant requirement.

When a search is conducted without a warrant, "[t]he Commonwealth carries the burden to demonstrate that the warrantless entry falls within a recognized exception to the warrant requirement."[77] In this case, the

---

[76] *King v. Commonwealth*, 302 S.W.3d 649, 653-54 (Ky. 2010) (citing *United States v. Santana*, 427 U.S. 38, 43 (1976)), *rev'd on other grounds by Kentucky v. King*, 563 U.S. 452 (2011).

[77] *King v. Commonwealth*, 386 S.W.3d 119, 122 (Ky. 2012); *Gallman v. Commonwealth*, 578 S.W.2d 47, 48 (Ky. 1979).

Commonwealth failed to raise an argument that any of the above-mentioned exceptions to the warrant requirement apply to Reed's case. So we find that the police acquisition of Reed's real-time CSLI was a warrantless search, unexcused by any established exception to the warrant requirement.

## C. The good-faith exception to the exclusionary rule does not apply in this case.

The exclusionary rule provides that evidence obtained through an illegal search is not admissible against the accused.[78] The rule extends not only to the evidence immediately discovered in the illegal search (Reed's real-time CSLI, in this case) but also to the "indirect products of official misconduct" (the weapon discovered in Reed's vehicle during the traffic stop, in this case).[79] This rule is a court-created remedy rather than an independent constitutional right.[80]

There are several established exceptions to the exclusionary rule, including the independent-source doctrine,[81] the inevitable-discovery

---

[78] *Wilson v. Commonwealth*, 37 S.W.3d 745, 748 (Ky. 2001).

[79] *Id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).

[80] *Davis v. United States*, 564 U.S. 229, 231-32 (2011).

[81] *Wilson*, 37 S.W.3d at 748-49 (adopting rule allowing trial court to admit evidence obtained in an illegal search if police independently acquired that evidence from a separate, independent source).

doctrine,[82] the attenuation doctrine,[83] and the good-faith exception.[84] But

these exceptions are similarly court-created, rather than constitutionally

mandated, and thus they are adopted and applied by state courts at the

discretion of each state.[85]

This Court embraced the good-faith exception to the exclusionary rule in

*Crayton v. Commonwealth*, in which a judge issued a warrant based on an

affidavit that "failed to provide sufficient information to support the initial

probable cause determination[,]" although the investigating officer had sought

and obtained the warrant in good faith.[86] The Court found that suppression of

the evidence obtained as a result of execution of the warrant would have no

deterrent effect on police misconduct because the error in this case was a

judicial one.[87] As such, the Court determined that suppression was not an

---

[82] *Hughes v. Commonwealth*, 87 S.W.3d 850, 853 (Ky. 2002) (adopting rule permitting "admission of evidence unlawfully obtained upon proof by a preponderance of the evidence that the same evidence would have been inevitably discovered by lawful means") (citing *Nix v. Williams*, 467 U.S. 431 (1984)).

[83] *Wilson*, 37 S.W.3d at 748 (adopting rule permitting admission of illegally obtained evidence "if the connection between the illegal conduct and the discovery and seizure of the evidence is highly attenuated") (citing *Segura v. United States*, 468 U.S. 796, 805 (1984) (internal citations omitted)).

[84] *Crayton v. Commonwealth*, 846 S.W.2d 684, 689 (Ky. 1992) (adopting rule permitting the admission of evidence obtained as a result of the execution of an invalid warrant, so long as the executing officer acted in good faith) (citing *United States v. Leon*, 468 U.S. 897, 922-24 (1984)).

[85] *Parker*, 440 S.W.3d at 386-87.

[86] 846 S.W.3d at 689.

[87] *Id.*

appropriate remedy—the good-faith exception to the exclusionary rule applied.[88]

In *Parker v. Commonwealth*, this Court adopted a specific and narrow application of the good-faith exception to the exclusionary rule in contexts where officers acted in "objectively reasonable reliance" on clearly established precedent from the Kentucky Supreme Court or the United States Supreme Court.[89] In an effort to avoid confusion for both officers and courts, the Court stated with specificity those courts whose decisions could be reasonably relied upon by law enforcement.[90]

In adopting this reasonable-reliance application, the *Parker* Court encouraged "a well-developed trial court record in all cases to the extent practical[,]" remarking that the sparse findings mentioned by the trial court were insufficient for meaningful appellate review.[91] Likewise, we encourage trial court records to clearly denote the ruling on the constitutionality of a search and, separately, the applicability of the good-faith exception to the exclusionary rule.

In this case, the Commonwealth argues that if this Court finds the acquisition of Reed's real-time CSLI to be a search, the good-faith exception to the exclusionary rule should apply. The Commonwealth contends that the

---

[88] *Id.*

[89] 440 S.W.3d at 387 (quoting *Davis*, 564 U.S. at 239).

[90] *Id.*

[91] *Id.* at 384.

officers in this case were acting in reasonable reliance on the United States Supreme Court's decision in *Knotts* that an individual "traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."[92]  Additionally, the Commonwealth argues that *Knotts* authorized the officers to use sense-enhancing technology to augment visual surveillance of an individual traveling on a public road.  This argument is another attempt at misdirection by the Commonwealth.  It is not the traffic stop of Reed's vehicle that runs afoul of constitutional protections but the means by which the officers obtained the knowledge that Reed would be present on that roadway at all.  The officers could not use technology to augment their surveillance of Reed because he was not under their surveillance.  We find that the warrantless acquisition of an individual's CSLI, whether real-time or historical, is not an exercise of "augmented visual surveillance" but an unreasonable search prohibited by the Fourth Amendment.

At the time Reed's charges arose, *Carpenter* had not yet been issued by the United States Supreme Court.  But this Court had published *Hedgepath v. Commonwealth*, in which we stated that the applicability of Section 10 and the Fourth Amendment to CSLI was an open question, decided by neither this Court nor the United States Supreme Court.[93]  The Commonwealth argues that this statement is mere dictum, unable to unsettle established law.  The

---

[92] 460 U.S. at 281.

[93] 441 S.W.3d at 125-26.

25

Commonwealth errs, however, in its assertion that established law existed that could be unsettled. Neither this Court nor the United States Supreme Court had, at the time in question, ruled definitively on the constitutional protections applicable to CSLI. We hold today that silence on a matter should not embolden law enforcement to assume that constitutional protections do not exist.

The good-faith exception to the exclusionary rule as adopted in *Parker* requires law enforcement to act in reasonable reliance upon binding precedent, not the lack of binding precedent. Unless this Court or the United States Supreme Court has expressed definitively that an area is not subject to constitutional protections or that an exception to the warrant requirement applies, law enforcement should obtain a warrant before taking action. After all, "[w]hen the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent."[94]

### III. CONCLUSION

Because individuals have a reasonable expectation of privacy in their real-time CSLI, the officers subjected Reed to a warrantless search by acquiring his real-time CSLI. No exception to the warrant requirement exists in this case, so we find Reed's real-time CSLI to have been illegally obtained by the officers and thus the CSLI and the evidence obtained therefrom should be

---

[94] *Willoughby v. Commonwealth*, 231 S.W.2d 79, 80-81 (Ky. 1950) (citing *Johnson v. United States*, 333 U.S. 10, 14 (1948)).

excluded from evidence. Because of this Court's decision in *Hedgepath*, we find that the officers' warrantless acquisition of Reed's CSLI was not in reasonable reliance on binding precedent from this Court. As such, the good-faith exception to the exclusionary rule is inapplicable in this case. We affirm the finding of the Court of Appeals and remand this case to the trial court for further proceedings in accordance with this decision.

All sitting. Hughes, Keller, and Nickell, JJ., concur. Minton, C.J., concurs by separate opinion in which Hughes and Keller, JJ., join. VanMeter, JJ., dissents by separate opinion, in which Conley and Lambert, JJ., join.

MINTON, C.J., CONCURRING: I concur in the result reached by the majority. But I write separately because I must say more to express my concern with this Court's longstanding reliance on *LaFollette v. Commonwealth* for the proposition that Section 10 of the Kentucky Constitution provides no protection distinct from that provided by the Fourth Amendment to the United States Constitution.[1]

The language of Section 10 and the Fourth Amendment are similar, and this Court has often looked to the United States Supreme Court's interpretation and application of the Fourth Amendment for persuasive guidance in construing Section 10.[2] On several occasions, this Court has held

---

[1] 915 S.W.2d 747 (Ky. 1996), *overruled on other grounds by Hunter v. Commonwealth*, 587 S.W.3d 298 (Ky. 2019).

[2] *Youman v. Commonwealth*, 224 S.W. 860, 862 (Ky. 1920).

27

that application of Section 10 to a specific set of facts yields the same result reached by the United States Supreme Court under the Fourth Amendment.

One such instance was in *Estep v. Commonwealth*, in which this Court considered the standard for a compartment search of a vehicle during a traffic stop.[3] The Court adopted the rule that "where probable cause justifies the search of a lawfully stopped vehicle, it also justifies the search of every part of the vehicle and its compartments and contents that may conceal the object of the search[,]" as set out in *United States v. Ross*.[4] This Court held that the United States Supreme Court's decision in *Ross* was in harmony with Section 10. As such, in that case, this Court found the search in question to be constitutional under both the Fourth Amendment to the United States Constitution and Section 10 of the Kentucky Constitution. But the Court's holding in *Estep* was specifically limited to the circumstances described in that case.[5]

Thirteen years later, in *LaFollette v. Commonwealth,* this Court considered the constitutionality of a warrantless fly-over surveying heat emissions from a suspected indoor marijuana growing operation.[6] Before considering the substantive issue at hand, the Court stated that Section 10 provided no greater protection than the Fourth Amendment, citing *Estep*.[7] In

---

[3] 663 S.W.2d 213 (1983).

[4] 456 U.S. 798, 823 (1982).

[5] *Estep*, 663 S.W.2d at 215-16.

[6] 915 S.W.2d at 749.

[7] *Id.* at 748.

so holding, the Court mischaracterized the holding in *Estep*[8] and erroneously derived an absolute, general rule tying protections provided by Section 10 to the Fourth Amendment without support from Kentucky law or this Court's prior precedent.[9]

Upon this Court rests the high duty to enforce our constitution's provisions.[10]  Not only under our own constitution but under the principles of American federalism, our Court enjoys a sovereignty under which we apply our own constitution and "safeguard the rights of [our] citizens secured thereby."[11] The hallmark of this sovereignty is that this Court is the "final arbiter of the meaning of the Kentucky Constitution, and our interpretation of its terms should not be circumscribed by the opinions of the federal courts interpreting the United States Constitution."[12]  We are tethered neither to the decisions of

---

[8] *Rainey v. Commonwealth*, 197 S.W.3d 89, 96 (Ky. 2006) (Roach, J., concurring) ("*LaFollette*'s cited authority does not stand for the claimed proposition.").

[9] *Id.* ("*LaFollette* committed the error of deriving an absolute, general rule from a specific situation. Such generalization, absent further explication, does not withstand scrutiny.").

[10] *Helton v. Commonwealth*, 243 S.W. 918, 919 (Ky. 1922) ("[T]he right of the citizen to protection against unlawful search and seizure was regarded by our forefathers, in the formation of this government, as one of the sacred things which would be vouchsafed to him at all times, and there is no higher duty resting upon the courts than the duty to enforce this constitutional provision . . . ."); *Earle v. Latonia Agric. Ass'n*, 106 S.W. 312, 314 (Ky. 1907) ("Our duty is to see that the Constitution is not violated, and to construe and enforce it as it is written . . . .").

[11] *Crayton v. Commonwealth*, 846 S.W.2d 684, 685 (Ky. 1992); *Commonwealth v. Wasson*, 842 S.W.2d 487, 492 (Ky. 1992), *overruled on other grounds by Calloway Cnty. Sheriff's Dep't v. Woodall*, 607 S.W.3d 557 (Ky. 2020).

[12] *Gingerich v. Commonwealth*, 382 S.W.3d 835, 845 (Ky. 2012) (Venters, J., concurring).

the United States Supreme Court nor to the reasoning embodied in those decisions when interpreting the meaning of the Kentucky Constitution.[13]

This is not to say that we ignore the "logic and scholarship" of the United States Supreme Court,[14] but instead that we maintain a freedom to reject applications and interpretations from that Court that we find "render meaningless the right[s] secured by the Constitution of Kentucky."[15]  We have found, on numerous occasions, that the protections offered by our state constitution align with those enshrined by the federal constitution.  However, "[a]lthough the weight of our modern search and seizure precedent comports with federal law, we are not beholden to interpreting every provision of the Kentucky Constitution as identical to its analogous federal counterpart."[16]

In characterizing *Estep*'s narrow holding as a broad and expansive one, this Court misspoke. But the more concerning flaw in *LaFollette* was the implication that this Court could not, under any circumstances, ever find Section 10 to provide greater protections than those afforded by the Fourth Amendment.[17]  In doing so, the Court in *LaFollette* could be read preemptively to lockstep this Court with federal Fourth Amendment jurisprudence. And this lockstepping was coupled with unreflective adoptionism—concluding that the Kentucky Constitution cannot afford protection for fly-over surveillance of heat

---

[13] *Parker v. Commonwealth*, 440 S.W.3d 381, 388 (Ky. 2014).

[14] *Crayton*, 846 S.W.2d at 687.

[15] *Commonwealth v. Johnson*, 777 S.W.2d 876, 880 (Ky. 1989).

[16] *Parker*, 440 S.W.3d at 388.

[17] 915 S.W.2d at 748.

emissions because the United States Constitution does not afford such protections.[18]  The Court simply did not consider the possibility of a different outcome.[19]  We recognize the general and well-accepted legal principle that the federal constitution simply provides a floor of constitutional protection.  While the federal constitution prevails over inconsistent state laws based on the Supremacy Clause, states are always free to provide expanded constitutional protections to their citizens in our system of cooperative federalism.[20]

Although the Court in *LaFollette* did not overtly claim to bind this Court to all subsequent Fourth Amendment jurisprudence from the United States Supreme Court, its generalization had this practical effect. And in the years since *LaFollette* was decided, it has been indiscriminately cited by this Court on 55 occasions for the proposition that Section 10 provides no greater protection than the federal Fourth Amendment.  We should take the opportunity today to reexamine the defective legal foundation on which *LaFollette* relies.  The practical result of this Court's statement in *LaFollette* is that Kentucky courts have been stifled in their interpretation and application of Section 10 and the

---

[18] *See generally* Robert F. Williams, *State Courts Adopting Federal Constitutional Doctrine: Case-by-Case Adoptionism or Prospective Lockstepping?*, 46 WM. & MARY. L. REV. 1499 (2005).

[19] *But see Commonwealth v. Cooper*, 899 S.W.2d 75, 77–78 (Ky. 1995) (holding Section 11 of the Kentucky Constitution to provide the same protections as the Fifth Amendment with exhaustive explanation of why the two provisions provide coextensive protection).

[20] *See, e.g., Michigan v. Long*, 463 U.S. 1032, 1040–42 (1983); *Arkansas v. Sullivan*, 532 U.S. 769, 772 (2001); William J. Brennan, Jr., *The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights*, 61 N.Y.U. L. REV. 535, 548-50 (1986); Jeffrey S. Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* 16–21 (Oxford Univ. Press 2018).

protections it affords.  We should decide today to abandon further unreflexive adoption.

Perhaps more importantly, by unreflexively lockstepping our interpretation of Section 10 with the federal courts' interpretation of the Fourth Amendment, this Court abdicates its role of enforcing our constitutional provisions and the protections they afford Kentuckians.  We should decline to prospectively lockstep our interpretation of Kentucky's constitutional guarantee to federal precedent and thereby allow the meaning of Kentucky's constitution to be recast with every shift in federal case law.

Thoughtful, principled methods of using United States Supreme Court jurisprudence exist in the interpretation of state constitutional provisions.[21]  I, in no way, discourage our state's courts from incorporating federal precedent into state constitutional analysis, but we should caution courts to avoid abdication of our judicial authority and responsibility to safeguard the rights of our citizens provided under our own constitution.

There are countless applications of the Fourth Amendment.  To say that Section 10 is co-extensive with the Fourth Amendment for purposes of one

---

[21] *People v. Caballes*, 851 N.E.2d 26, 42-43 (Ill. 2006) (adopting a "limited lockstep approach" that looks "first to the federal constitutional question, and only if federal law provides no relief turn to the state constitution to determine whether a specific criterion . . . . justifies departure from federal precedent"); *State v. Gomez*, 932 P.2d 1, 7 (N.M. 1997) (adopting an "interstitial approach," under which "the court asks first whether the right being asserted is protected under the federal constitution. If it is, then the state constitutional claim is not reached. If it is not, then the state constitution is examined"); *State v. Cadman*, 476 A.2d 1148, 1150 (Me. 1984) (adopting a "primacy approach" under which the state constitution is the primary protector of rights and the federal constitution is only implicated if the state constitution is found not to protect or recognize the right at issue).

application is not to say the protections provided by the two are co-extensive in *every* application. On this point, the Court in *Estep* acted properly, and the Court in *LaFollette* erred.

I urge this Court to adopt the position taken by Justice Roach, writing in concurrence in *Rainey v. Commonwealth*:

> To begin, *LaFollette*'s cited authority does not stand for the claimed proposition. *LaFollette* notes that Section 10 and the Fourth Amendment are similar, thus the United States Supreme Court's interpretation of the Fourth Amendment, though not binding, is certainly informative and persuasive in our interpretation of Section 10. . .
>
> In essence, *Estep* held that in a particular instance, Section 10 provided the same protection as the Fourth Amendment. But nowhere does *Estep* state that Section 10 is only coextensive with the Fourth Amendment. . . . *LaFollette* committed the error of deriving an absolute, general rule from a specific situation. Such generalization, absent further explication, does not withstand scrutiny. . .
>
> The issue could arise in a situation where the United States Supreme Court has interpreted the Fourth Amendment in such a way as to formulate a legal rule that is inconsistent with the original understanding of Section 10 of the Kentucky Constitution. In such a case, we should decline to defer to the United States Supreme Court's interpretation of the Fourth Amendment when interpreting our own constitutional provision, which is an independent legal protection with a different, albeit related, history and origin.[22]

---

[22] 197 S.W.3d at 95-97 (Roach, J., concurring). The Pennsylvania Supreme Court similarly views Article I, Section 8 of the Pennsylvania Constitution, which is almost identical to Section 10 of the Kentucky Constitution, as providing an individual right independent from the Fourth Amendment. *Commonwealth v. Shaw*, 770 A.2d 295, 299 (Pa. 2001) ("Article 1, Section 8 has an identity and vitality that is separate and distinct from that of the Fourth Amendment . . . . A state may provide through its constitution a basis for the rights and liberties of its citizens independent from that provided by the Federal Constitution." (quoting *Commonwealth v. Kohl*, 615 A.2d 308, 314 (Pa. 1992)); *see also Commonwealth v. Cass*, 709 A.2d 350, 358–59 (Pa. 1998) (noting that the text of Article I, Section 8 is similar in language to the Fourth

Insofar as *LaFollette* stands for the proposition that Section 10 and the Fourth Amendment are co-extensive in every application, we should overrule it.

Hughes and Keller, JJ., join.

VANMETER, J., DISSENTING: I respectfully dissent.

During the suppression hearing in this case, the trial court determined that Reed, Caldwell's acquaintance, used a cellphone to call and entice Caldwell to meet him at a service station. When Caldwell arrived, Reed robbed him of $500 at gunpoint, after which Reed entered the passenger seat of a vehicle and fled the scene. Caldwell immediately contacted the police, providing the officer at the scene with the cell number Reed used to call him. The responding officer, Officer Lyons, relayed that phone number to his dispatch unit, who in turn requested the phone's cell service provider attempt to locate the cellphone. The provider was successful, and over the course of the next several hours, dispatch communicated with the cell service provider to track Reed's movements on Kentucky public roads, using the real-time CSLI data provided to the agency.

In concluding that obtaining Reed's CSLI constituted a search for Fourth Amendment purposes, today's majority relies heavily, as it must, on the United States Supreme Court's recent decision in *Carpenter v. United States*, ---U.S.---, 138 S.Ct. 2206 (2018), which held that individuals retained a constitutionally

---

Amendment, but that "it is not the text itself which imbues Pennsylvania jurisprudence with its unique character but, rather, the history of our case law as it has developed in the area of search and seizure[]").

34

cognizable interest in their *historical* CSLI.  The majority's reliance on *Carpenter* as a basis to extrapolate a reasonable expectation of privacy in real-time CSLI is misplaced.  As Justice Roberts made clear in *Carpenter*, historical CSLI presents several legitimate and serious privacy concerns, such as the state's ability to reconstruct an individual's "familial, political, professional, religious and sexual associations."  *Id.* at 2217 (quoting *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring)).  The "retrospective quality" of this data allows police "access to a category of information otherwise unknowable."  *Id.* at 2218.  Notably, none of those concerns are presented in this case, in which officers were attempting to apprehend an armed man who had just completed a brazen robbery in a public space before entering a vehicle and fleeing the scene.[1]

Moreover, and crucially, the *Carpenter* decision was a targeted response to Justices Sotomayor and Alito's twin concurrences in *United States v. Jones*, which reasoned, generally, that collecting large swaths of historical data violated "society's expectation that . . . law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual[ ] . . . for a very long

---

[1] I am compelled to note, that with regards to a suppression hearing, I do not understand the majority to limit the fact-finding authority of the Commonwealth's trial courts.  I am, however, concerned that the majority opinion would not have found the exigent circumstances exception to the warrant requirement satisfied in this case, had the Commonwealth properly preserved the matter for our review.  At the time of his pursuit, officers knew Reed was armed and had just committed a robbery under the bright lights of a service station.  Certainly, Reed's actions would have led a reasonable officer to believe, that under the totality of the circumstances, swift action was necessary to prevent an imminent threat to other innocent Kentuckians.

period." *United States v. Trice,* 966 F.3d 506, 518 (6th Cir. 2020) (quoting *Carpenter,* 138 S. Ct. at 2217 (quoting *Jones,* 565 U.S. at 430, 132 S.Ct. 945 (Alito, J., concurring))). However, the *Carpenter* majority, despite these concerns, refused to extend its holding to real-time CSLI, leaving untouched its reasoning in *United States v. Knotts,* 460 U.S. 276 (1983), because *Knotts* remained applicable in cases involving rudimentary surveillance techniques[2] *and* because of the "limited use" the government had for signals from trackers during "a discrete automotive journey."[3] *Id.* (internal quotations omitted).

The *Trice* court's analysis of *Carpenter* is not unique, and in *United States v. Hammond,* 996 F.3d. 374 (7th Cir. 2021), *cert. denied,* No. 21-752, 2022 WL 1205839 (Apr. 25, 2022), the Seventh Circuit reasoned that, because *Carpenter* refused to answer the question of real-time CSLI collection, judges must look to the Supreme Court's *pre-Carpenter* jurisprudence to answer the question at hand. I find the reasoning of the *Hammond* panel persuasive, both that the *Knotts* framework is consistent with *Carpenter,* in so far as the real-

---

[2] The majority likens pinging a cell-phone akin to a physical trespass, but its reasoning ignores the conclusions in both *Katz* and *Knotts,* that a physical trespass is not dispositive in determining whether the government invaded an individual's "legitimate expectation of privacy." *Knotts,* 460 U.S. at 285.

[3] In *Knotts,* the government placed a beeper in a chloroform drum which Knotts picked up and drove to his cabin. Government agents were able to monitor the movement of the drum and, hence, Knotts' accomplice as he traveled the public roads. 460 U.S. at 277. The Court held that "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Id.* at 281. And, further, "[w]hen [the accomplice] travelled over the public streets he voluntarily conveyed to anyone who wanted to look the fact that he was travelling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property." *Id.* at 281-82.

time CSLI sought is limited in scope and purpose, and that individuals do not have a reasonable expectation of privacy in their real-time CSLI while traveling over public roads.

The facts in *Hammond* are similar to those presented in this case.[4] Following a three-day investigation in which law enforcement focused on Hammond as the prime suspect in a series of robberies, officers, prior to engaging Hammond in a pursuit, pinged his phone, locating him at a hotel in

---

[4] One significant difference in this case and almost every other case involving real-time CSLI is that other cases involve location of a suspect who has been under investigation for some period of time. *Hammond*, 996 F.3d 374 (7th Cir. 2021) (following investigation lasting over three weeks involving a series of armed robberies, law enforcement used real-time CSLI to locate suspect), cert. denied, No. 21-752, 2022 WL 1205839 (Apr. 25, 2022)); *United States v. Riley*, 858 F.3d 1012 (6th Cir. 2017) (law enforcement used real-time CSLI to locate suspect four days following his robbery of a store); *State v. Brown*, 202 A.3d 1003 (Conn. 2019) (during lengthy investigation involving multiple robberies, law enforcement obtained historical CSLI records in violation of state statute and subsequent use of prospective CSLI was therefore likewise impermissible); *Tracey v. State*, 152 So.3d 504 (Fla. 2014) (following one-month investigation involving drug trafficking, law enforcement used real-time CSLI to locate suspect); *State v. Sylvestre*, 254 So.3d 986 (Fla. Dist. Ct. App. 2018) (murder investigation using historical CSLI pursuant to warrant and a cell site simulator); *People v. Costan*, 152 N.Y.S.3d 162, 197 A.D.3d 716, leave to appeal denied, 37 N.Y.3d 1095, 178 N.E.3d 433 (N.Y. App. Div. 2021) (two-month investigation into more than a dozen robberies); *Commonwealth v. Pacheco*, 263 A.3d 626 (Pa. 2021) (year-long drug trafficking investigation using real-time CSLI)*; State v. Muhammad*, 451 P.3d 1060 (Wash. 2019) (law enforcement used real-time CSLI to locate suspect four days following his rape and murder of victim).

The one case which has facts most similar to this case is *Sims v. State*, 569 S.W.3d 634 (Tex. Crim. App. 2019). In *Sims*, the Texas Court of Criminal Appeals held that the defendant, suspected of killing his grandmother, "did not have a legitimate expectation of privacy in his physical movements or his location as reflected in the less than three hours of real-time CSLI records accessed by police by pinging his phone less than five times." *Id.* at 646. *Sims* is different from Reed's case in that the phone being tracked was not apparently used in the murder. By contrast, in this case, the cell phone tracked was an instrumentality of the crime used to lure Caldwell to the scene of the crime and law enforcement did nothing more than use the cell phone to attempt to locate the perpetrator. As noted by Justice Rehnquist in *Knotts*, "[W]e have never equated police efficiency with unconstitutionality, and we decline to do so now." 460 U.S. at 283-84.

South Bend, Indiana. *Id.* at 381. During the pursuit Hammond initially evaded officers, who were once again forced to ping his phone before resuming their chase and eventually apprehending him. In concluding that *Knotts*, not *Carpenter*, presented the appropriate analytical framework, the *Hammond* court reasoned that the police chase lasted only six hours, the real-time CSLI collected had no "retrospective quality" and that "[l]aw enforcement used the real-time CSLI to find Hammond's location in public, not peer into the intricacies of his private life."[5] *Id.* at 388-89. The *Hammond* court ultimately concluded that the police's "ability to locate Hammond on public roads . . . using real-time CSLI is not inconsistent with society's expectations of privacy from law enforcement's prying eyes[;]" and therefore was not a search. *Id.* at 390, 392. I would apply that reasoning in this case.

I would reverse the Court of Appeals and reinstate the Woodford Circuit Court's judgment.

Conley and Lambert, JJ., join.

---

[5] The majority today warns that real-time CSLI carries the same risks as historical CSLI, and that allowing officers even this limited surveillance tool would "empower government agents to invade individuals' most private and closely-held constitutionally protected activities." Of course, the record in this case is entirely devoid of any information regarding Reed's religious, political, or other private associations.

COUNSEL FOR APPELLANT:

Daniel J. Cameron
Attorney General of Kentucky

Jeffrey A. Cross
Matthew F. Kuhn
Brett R. Nolan
Office of Solicitor General


COUNSEL FOR APPELLEE:

Adam Meyer
Assistant Public Advocate